Roberto E. MENDOZA, Plaintiff,

v.

SSC & B LINTAS, NEW YORK, Defendant.

No. 92 Civ. 0709 (RWS).

United States District Court, S.D. New York.

Feb. 5, 1996.

Alterman & Boop, P.C. by Daniel L. Alterman, of Counsel, New York City, for Plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison by William C. Silverman, of Counsel, New York City, for Defendant.

## OPINION

SWEET, District Judge.

The plaintiff Roberto Mendoza ("Mendoza") in an action against his former employer, defendant SSC & B, New York ("Lintas"), alleged tortious interference with contract and discriminatory conduct arising out of a denial of promotion and his discharge as retaliation for complaints filed by Mendoza with the New York State Division of Human Rights ("SDHR"). The action was tried before a court and jury, and upon all the prior proceedings, the evidence submitted, and findings and conclusions set forth below, judgment will be entered dismissing the complaint.

### Prior Proceedings

On January 28, 1985, Mendoza filed a charge of discrimination with the SDHR alleging that he had been discriminated against on the basis of his national original because he had not been promoted while non-Hispanic trainees who had been subsequently hired, had been promoted. Lintas opposed the charge. On September 30, 1987, the SDHR found no probable cause. The Equal Employment Opportunity Commission ("EEOC") upheld this finding. Mendoza took no further action.

On May 18, 1988, Mendoza filed a second charge against Lintas again alleging discrimination and retaliation in failing to promote.

The EEOC issued a Determination and Right to Sue Letter on November 15, 1991. Mendoza filed his complaint in this action on January 29, 1992, asserting claims against Lintas under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("§ 1981"), and for defamation and intentional interference with contract. Lintas moved to dismiss the § 1981 and defamation claims pursuant to Rule 12(b)(6), Fed. R.Civ.P., which motion with respect to the § 1981 claims was converted to one for summary judgment. In an opinion issued August 11, 1992, the motion was granted as to the § 1981 and libel claims. *Mendoza v. Lintas*, 799 F.Supp. 1502 (S.D.N.Y.1992).

Discovery proceeded, and Lintas moved for summary judgment dismissing Counts I and IV of the complaint. By opinion of April 5, 1995, the claims of failure to promote which were the subject of his first SDHR proceeding were dismissed as time-barred.

From November 6 to November 8 trial was had before the court and jury on the remaining claims of tortious interference with contract and retaliatory discharge. On November 8, the jury in a Special Verdict, determined that Lintas had not tortiously interfered with Mendoza's relationship with the firm that had hired him part-time after his discharge from Lintas. Final argument on the improper discharge claim was held on December 6, 1995.

### The Facts

Mendoza was born in Mexico and is a naturalized citizen of the United States. He had nine years experience in graphic arts in both California and New York and had received numerous scholarships and awards for creative work before being hired by Lintas. He has had a lifelong interest in the visual arts and is also a poet and photographer. He is a sensitive and sincere person who has become convinced that his career reverses are attributable to his national origin.

Mendoza was hired as a Paste-up Assistant by Lintas, a New York advertising agency, in February 1984 and worked in the bullpen, a common area with other Paste-up Assistants. As such he assisted various account groups in the production of ads by performing mechan-

ical tasks, such as mounting story boards, typesetting and layout work.

According to Mendoza, at the time he was hired by Lintas he was informed that he was over-qualified for the entry level position of Paste-up Assistant, that he would be promoted to the position of Assistant Art Director within a year, and that promotions to Assistant Art Director were made on a first-hired first-promoted basis. Until the promotion on January 25, 1985 of Kenneth Evans, a Caucasian, who was hired after Mendoza, promotions to Assistant Art Director were made solely on a first-hired, first-promoted basis. On January 28, 1985, Mendoza filed his first discrimination complaint with the SDHR.

In a conversation with Mariann Miller on March 27, which was the subject of a contemporaneous memo, Mendoza was told of his promotion to Assistant Art Director, that prior to that time the only budgeted opening was the one for another group for which Kenneth Evans "style of book was decided as appropriate." He was also told his rate of progress would determine future promotions and that there was no automatic promotion to Art Director or particular time-frame for advancement. Mendoza stated he did not wish to be considered as a "token addition" to the group.

In April 1985, the promotion to Assistant Art Director was formalized and Mendoza was assigned to the account group headed by Robert Conlon ("Conlon") who in turn reported to Executive Creative Director Michael Shalette ("Shalette"). An Assistant Art Director at Lintas assisted senior members of the creative team. The primary function of the job involved largely mechanical work (similar to the work in the bullpen) to transform the ideas of others into a presentable form of advertising. The position was also a training ground and testing area for the next position of Art Director. Assistant Art Directors were also given the opportunity to perform more creative work as well and aggressively sought out such opportunities. The position of Assistant Art Director was not a permanent one at Lintas and did not automatically lead to a promotion. During the time Mendoza was an Assistant Art Director at least twelve Assistant Art Directors

left Lintas without becoming Art Directors. The decision to promote an Assistant Art Director to Art Director was based primarily on creative ability, developing imaginative advertising concepts and translating them into effective advertising. The decision to promote was made by Frank DeVito ("DeVito"), Director of Creative Services, based upon recommendations by the group creative directors. The elements and evaluation of creativity were necessarily highly subjective.

Ira Chynsky ("Chynsky"), Director of Creative Services Administration and Frank Ryder ("Ryder"), Personnel Director, were aware of Mendoza's initial discrimination complaint and were in a position to make decisions and recommendations regarding Mendoza's salary, promotion, and termination.

From April 1985, and continuing for the next three years, Mendoza's work was performed in a satisfactory manner. Although he requested to have a copywriter assigned to work with him, no such assignment was made. Prior to promotion to Art Director at Lintas, an Assistant Art Director would customarily have regular experience working as an Art Director in a team with a copywriter in addition to performing his assistant duties. While Mendoza was never teamed with a copywriter during his employment by Lintas, during the period from late 1987 through early 1988 Mendoza had the most frequent opportunities of his career to work with copywriters on a project basis.

In November 1985, Chynsky had a brief conversation with Mendoza in which he stated that the events of the past would not be repeated. Mendoza testified that at the time he understood the comment to mean that no further promotion would be granted, but he took no action based on this equivocal conversation. Chynsky did not recall the conversation.

During the period from 1985 to 1987, Mendoza represented Lintas at meetings with clients along with Lintas account managers and writers and on occasion was often the only creative visual artist present. He was listed as "Art Director" on presentations made by Lintas to its clients and received

praise for his work on the teams which worked on the accounts of the U.S.I.A. and in connection with Spanish television and print ads. During this period, Mendoza was not promoted from the position of Assistant Art Director to Art Director nor was any formal review of his performance conducted. Lintas during this period had no formal evaluation procedure, and no objective criteria for promotion were formulated. Others who were Caucasian were formally evaluated and promoted.

In 1987, after Conlon and Nye left the agency, Mendoza reported directly to Shalette and the Art Directors in his group. Shalette came into contact with Mendoza approximately once every two weeks, primarily during the regular meetings in which he reviewed the group's creative work. Although never formally reviewed by Shalette, Mendoza did receive informal reviews during this period. According to Shalette, Mendoza's participation at meetings was "minimal," and the consensus of the people who worked with Mendoza was that his contributions were "predominantly in the area of the more mechanical."

In January 1987, an evaluation policy was instituted, and Shalette informed Mendoza that such a procedure would be instituted. In April 1987 Mendoza met with both Shalette and Chynsky and requested a promotion review and a salary increase. He repeated these requests in May 1987, July 1987, and November 1987. Chynsky and Shalette discussed Mendoza during April and May 1987. No promotion was granted. In September 1987, the SDHR found no probable cause with respect to Mendoza's first complaint.

Mendoza worked as an Art Director with Laurie Ellen Murphy ("Murphy"), a Vice President and Associate and Creative Director on the Snuggle account from November 1987 to August 1988. During this period, Mendoza also worked with a copywriter on a major campaign in connection with the Heineken account and produced work which was considered satisfactory.

In early 1988, Shalette discussed Mendoza's lack of development with Chynsky, explaining that he could get "more value" out of the position of Assistant Art Director from someone other than Mendoza. Also in early 1988, following his conversation with Chynsky, Shalette met with Mendoza and testified that he advised Mendoza that:

> he had been an assistant art director for a number of years and it was not a position that we had as ongoing, that we are supposed to progress from that to art director, and that he had not shown the capability to do that. I said to him that he would be given, I believe it was, a two-month period in which to demonstrate that he had that capability, and that if that was not forthcoming, that he should seek employment elsewhere.

Mendoza placed this conversation in January; Shalette recalls it occurring in March. Both recall the substance of the conversation similarly. ·

Shalette produced a memorandum based upon handwritten notes confirming this conversation which was typed on or about May 12, 1988 (the "May 12 Memo"). Shalette stated that his secretary did not type the memorandum and that he did not know who did. The May 12 Memo was found by Shalette after he left Lintas in late 1992 or early 1993 and first produced in February of 1993 shortly before Shalette's deposition. Chynsky testified that he saw the memorandum but never received a copy of it and did not have it in his files. Chynsky remembered speaking with Shalette and discussing the substance of the memo before Shalette's meeting with Mendoza and also remembered seeing a copy of the memo in 1988. The draft was never put in final form, no copy was sent to Mendoza.

Mendoza added that Shalette advised him that there was no possibility of growth and that his (Shalette's) opinion would never change. Mendoza's testimony on this addition is credible but fails to establish any discriminatory intent as opposed to a strongly stated view of the merits of Mendoza's work.

On May 18, 1988, Mendoza filed a second charge with the SDHR, alleging that Lintas had discriminated against him on the basis of his national origin and had retaliated against him for filing his first charge with the

SDHR. This charge was referred to the EEOC by the SDHR and filed with the EEOC by July 1, 1988.

On July 15, 1988, Mendoza sent a memo to Chynsky requesting a transfer to the account group headed by Executive Creative Director Sue Read ("Read"), for whom he already had been working on a project basis. Chynsky granted Mendoza's request for a transfer. In doing so, he also told Mendoza that the position of Assistant Art Director was not a permanent one at Lintas and that he had not yet demonstrated the growth required for promotion to Art Director. Chynsky memorialized that conversation in a memo dated August 22, 1988, which Mendoza admits discussing with Chynsky after he received it. The August 22 memo contained language identical to the May 13 Memo of Shalette. Chynsky advised Mendoza he would be reviewed in three months. Chynsky testified that he based his opinion of Mendoza's lack of creative development on discussions with his supervisors, Shalette, Nye, Monsen and Short.

Mendoza's work as an Assistant Art Director for the Read group was satisfactory.

On August 30, 1988, Shalette submitted an affidavit for submission to Mendoza's discrimination charge which did not refer to the May 12 Memo or any written documentation of Mendoza's performance and lack of creativity. The earlier conversation with Mendoza was reported, and its substance was consistent with Shalette's trial testimony. Mendoza vigorously attacked the authenticity of the May 12 Memo, even to the point of suggesting that its *ex post facto* creation established a discriminatory, or retaliatory intent on the part of Shalette. There is no direct evidence to that effect and such an inference has not been established by the evidence. The circumstances surrounding the May 12 Memo and its discovery show imprecise record handling rather than retaliation.

While assigned to Read's group, Mendoza worked for all the Art Directors in the group and was given the opportunity to work with a copywriter on only one occasion. His work as an Assistant Art Director was satisfactory. Read supervised between six and ten Art Directors at any given time and did not have daily contact with everyone in her group. Read did not recall evaluating Mendoza, filling out an evaluation form for Mendoza or reviewing a form filled out by a subordinate evaluating Mendoza.

Mendoza was not promoted to Art Director because his superiors considered his qualifications, particularly his creative talent, to be lacking. Shalette held a negative opinion of Mendoza's work and had spoken to Marion Monsen, the Art Director on the Snuggle account who was also critical of Mendoza's work on that account.

Mendoza's salary history at Lintas was comparable to that of other Assistant Art Directors who were not promoted to Art Director. He earned more than five other Assistant Art Directors who, like Mendoza, were never promoted to Art Director. While some Assistant Art Directors received larger raises than Mendoza, others received smaller raises. The period in which Mendoza worked for Lintas was difficult financially, and it was common for people to go without raises for extended periods of time. Although Mendoza waited 14 months, 17 months and 26 months between raises, other Assistant Art Directors waited similarly long periods.

The failure to give Mendoza higher and more frequent raises was based on a combination of the agency's budgetary constraints and the judgment of Mendoza's supervisors that he was being adequately compensated for the quality of the work he produced. Both reasons were communicated to Mendoza in response to his requests for more pay.

Mendoza was not paired with a permanent copywriter and was given less creative work than other Assistant Art Directors because he had not demonstrated as much creative talent as other Assistant Art Directors, who were more eagerly sought after by copywriters and Art Directors.

During his employment at Lintas, Mendoza received memoranda while employed by Lintas acknowledging the hard work and effort put into particular advertising campaigns and, for the most part, are directed to long distribution lists without singling Mendoza

out. Such memos were quite common at Lintas. Two of them relate to Mendoza's translation of advertisements into Spanish, another praises Mendoza for handling "eleventh hour changes" on a "dreary little exercise" and another, although addressed to Mendoza, does not mention him specifically (just the team) in the body of the memo. One memo from Marilyn Gottlieb, the public relations director at Lintas, not a supervisor, singles Mendoza out for the quality of his ideas, thanking Mendoza for working on a series of "in-house ads." Frank Murakami ("Murakami"), Senior Vice President and Executive Art Director, wrote an employment recommendation for Mendoza, and stated that from the spring of 1986 to November 1987, "his initiative talents and general enthusiasm for minor or complex projects was always well handled with ultimate consideration for detail and professionalism."

In August 1989, after cutbacks in advertising spending by major clients, Lintas was forced to reduce expenses by $1 million through a reduction in force. As part of this process, Chynsky received a reduction target from the financial group, which he discussed with DeVito. Chynsky and DeVito then worked with the group heads to prepare a list of those employees whose termination would have the least impact on the agency. The complete list was shared with all group heads so that if someone on the list were considered more valuable than someone not on the list, the names could be switched. No group head suggested that Mendoza's name be taken off the list. Mendoza was among thirty people from the creative department who were laid off pursuant to the August 1989 reduction in force which included three Art Directors, two Assistant Art Directors, three Art Trainees, two Associate Creative Directors, a Group Creative Director, a Creative Supervisor, two Copywriters, as well as administrative personnel.

In performing its reduction in force, Lintas followed the personnel procedures of its parent company, Interpublic. All the terminations in August 1989—including Mendoza's—were reviewed by the personnel and legal departments, and every effort was made to see if there were other positions available within the company's network of agencies. Because Mendoza's dismissal was the result of a financial cutback, Lintas was not required by its procedures to place him on probation before discharging him.

As a consequence of the reduction in force, three minority employees below the level of Vice President were dismissed. Those remaining were Caucasian.

Lintas took no action against Mendoza on the basis of his national origin and Mendoza testified that the only individuals at Lintas who discriminated against him were Marian Millar (whose alleged discriminatory conduct was the subject of his first administrative complaint, on which Mendoza failed to sue timely), Shalette and Chynsky. However, when asked at his deposition whether he was ever discriminated against by Shalette, Mendoza responded, "I am not aware of that directly." In regard to Chynsky, Mendoza disavowed his discrimination claim altogether at trial: "The only reason I say what Mr. Chynsky did so to me was because of my first charge. That's how I believe that came about." Mendoza was never subject to ethnic slurs or demeaning names while at Lintas.

Lintas took no action against Mendoza in retaliation for filing a discrimination complaint. Mendoza's complaint was not publicized within the agency. Shalette did not learn of the first discrimination complaint until the time of Mendoza's second complaint, in May 1988 after his conversation with Mendoza concerning his future and his lack of qualification as Art Director. Mendoza has failed to establish a link between his complaints of discrimination and any objective evidence of his denial of promotion and his discharge, nor is there a rational basis to infer such a link other than the undisputed events themselves. Read was unaware of his discrimination claim at the time of his transfer into her group.

In September 1989, as part of a previously established hiring program, thirteen Caucasians were hired as trainees, seven of which were hired at salaries equivalent to the salary earned by Mendoza.

Lintas had no written equal employment opportunity or affirmative action policy, nor a written policy regarding how to file a complaint of discrimination within the company. Lintas' stated policy was to promote from within and place an employee in another department or a sister company when an employee may be terminated because of a decrease in the volume of work and to rehire former employees.

Mendoza sought other employment by registering with two New York and one New Jersey headhunters, by responding to newspaper advertising and by other inquiries as to possible availabilities and was employed on a short-term basis and primarily on a freelance basis in the years 1989, 1990, and 1991. As established in the jury trial, he was hired early in 1990 for part-time work by John Grogan, former Lintas employee who had formed a company MGI which was negotiating with Interpublic. When Grogan learned of Mendoza's discrimination claim, he discontinued employing Mendoza. This termination was the subject of the Special Verdict of the jury in favor of Lintas.

Chynsky in his testimony was terse, believable, and professional. Shalette, testifying by deposition, was occasionally contradictory and confusing and revealed a somewhat impatient personality. He exhibited no bias, however, and in the main and on essential issues was also credible. Mendoza, perhaps understandably, was unable to accept that the Lintas employment decisions were based on good faith evaluation and consistently from 1985 viewed his employer's actions as influenced by Mendoza's national origin. Other than this cast of mind, his testimony also was credible.

### Conclusions of Law

### Mendoza Did Not Establish a Title VII Violation

■ To establish a *prima facie* case of discrimination, a plaintiff must establish that he belongs to a protected class; that he applied for and was qualified for a promotion for which the employer was seeking applications; that despite his qualifications he was rejected; and that after his rejection the job remained open and the employer continued to seek applicants having plaintiff's qualifications. *Fisher v. Vassar College,* 66 F.3d 379, 391 (2d Cir.1995).

■ To establish a *prima facie* case of retaliation, a plaintiff must prove that he was engaged in a protected activity of which his employer was aware; that he suffered some disadvantageous employment action; and that there was a causal connection between the protected activity and the adverse employment decision. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 64 (2d Cir.1992). Where the adverse employment decision is an alleged failure to promote the plaintiff, he must also show that he was qualified for the position for which he sought promotion. *Lambert v. Genesee Hosp.,* 10 F.3d 46, 57 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).

■ As found above, Mendoza has not established a *prima facie* case of either discrimination or retaliation. Mendoza has admitted that he is aware of no basis for his discrimination claim and his failure to achieve promotion to Art Director was the result of a good faith determination that he was not qualified. Finally, there was no causal connection between the employment action of which Mendoza complains and the alleged protected activity: his failure to receive a promotion, to get raises and ultimately to retain his job had nothing to do with his prior discrimination complaint. Indeed, Shalette was not even aware of Mendoza's first discrimination complaint at the time when Shalette made unfavorable determinations concerning him.

■ In addition, his Title VII claims fail because Lintas has come forward with legitimate, non-discriminatory/non-retaliatory reasons for its employment actions. Promotion to Art Director was not automatic; Mendoza's supervisors believed that he lacked the creative ability to be effective in that position. They believed that other Assistant Art Directors were more deserving of promotions and raises. *See Shtino v. Aponte,* 1995 WL 396581 at *7 (July 6, 1995 S.D.N.Y.) ("In putting forth legitimate non-discriminatory reasons for not promoting plaintiff, defen-

dants need not prove or even assert that those above plaintiff had greater objective qualifications.") they also believed that when a reduction in force was necessary, Mendoza's loss would be less harmful to the company than the loss of more talented employees.

To refute Lintas' showing of legitimate reasons for its actions, Mendoza had to prove, 1) that the purported reasons were merely pretextual, and 2) that Lintas intentionally discriminated or retaliated against him. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, ——, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993). Mendoza has not met that burden.

Submit judgment on notice.

It is so ordered.